Melissa Grant (SBN 205633)
Melissa.Grant@capstonelawyers.com
Roxanna Tabatabaeepour (SBN 260187)
Roxanna.Taba@capstonelawyers.com
Ryan Tish (SBN 274284)
Ryan.Tish@capstonelawyers.com
Alexander Wallin (SBN 320420)
Alexander.Wallin@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1860
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396

Attorneys for Plaintiff JACQUELINE AHUMADA

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JACQUELINE AHUMADA, individually, and on behalf of other members of the general public similarly situated, and as an aggrieved employee pursuant to the Private Attorneys General Act ("PAGA"),<br><br>Plaintiff,<br><br>vs.<br><br>GIORGIO ARMANI CORPORATION, New York corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 3-24-cv-01175 RSH-DEB<br><br>*[Assigned to the Hon. Robert S. Huie, Courtroom 3B]*<br><br>**DECLARATION OF AMANDA L. SCOTT, Ph.D., IN SUPPORT OF PLAINTIFF JACQUELINE AHUMADA'S MOTION FOR CLASS CERTIFICATION**<br><br>**Date:** December 8, 2025<br>**Time:** TBD<br>**Place:** Via Zoom<br><br>Complaint Filed: May 31, 2024<br>Removal Date: July 8, 2024<br>FAC Filed: August 28, 2024 |

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JACQUELINE AHUMADA, individually, and on behalf of other members of the general public similarly situated, and as an aggrieved employee pursuant to the Private Attorneys General Act ("PAGA"),

Plaintiff,

v.

GIORGIO ARMANI CORPORATION, a New York corporation; and DOES 1 through 10, inclusive,

Defendants.

Case No.: 24CV1175 RSH DEB

First Report of Amanda L. Scott, Ph.D.

November 3, 2024

I, Amanda L. Scott, declare:

Unless the context indicates otherwise, I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would testify competently thereto. I make this declaration in support of Plaintiffs' Motion for Class Certification.

## 1. Qualifications

1. I am a co-owner of The Strategy Team, Ltd., a research firm in Columbus, Ohio. I have been employed by The Strategy Team since 2002; I joined the firm full time in 2005 and became a partner and owner in 2015. Since 2005, my work at The Strategy Team has entailed conducting high quality social science research, either alone or in collaboration with colleagues both inside and outside of my firm. My focus at The Strategy Team has been on projects that required the collection and analysis of primary and secondary quantitative research data, including work to support the completion of surveys for class action litigation, particularly in the areas of wage and hour law.

2. I earned a B.A. in Psychology and Sociology from Ohio Wesleyan University (OWU) in Delaware, Ohio in 2000. At OWU, I was trained to conduct research in psychology with a particular emphasis on experimental designs. I was a research assistant on several research projects, and I directed my own independent

study (an experimental study focused on decision-making in a legal context). I also received a summer research fellowship to conduct research with Dr. Harry Bahrick, a leading expert in human memory.

3. I earned an M.A. and Ph.D. in Social Psychology from The Ohio State University (OSU), a program which is consistently one of the highest rated programs in the country in that discipline by U.S. News & World Report.

4. I was awarded a fellowship from OSU to support my first year of research training. I was awarded a graduate research fellowship from the National Science Foundation to fund three years of my research, which focused primarily on stereotyping, group behavior, and legal decision making. I also received a Critical Difference for Women Grant to fund travel to present my research.

5. During my training, I completed multiple graduate level classes on research methodology and quantitative analysis, including classes focused on conducting survey research, and I completed a survey research methods practicum with Dr. Herb Weisberg, who has written extensively about the Total Survey Error Approach. I also served as the field director of a consumer survey at the Port Columbus International Airport with Dr. Jon Krosnick, an internationally recognized survey research expert, and Dr. Randy Olsen, the director of the Center for Human Resource Research (CHRR) at OSU. In this role, I was responsible for piloting one of the first data collection efforts at CHRR that employed handheld electronic devices.

6. During college and graduate school, I was employed as an intern by the Ohio Department of Job and Family Services. In this role, I was responsible for quantitative analyses to meet federal reporting requirements to document outcomes of Ohioans who left the Temporary Assistance for Needy Families program.

7. In 2007, my business partner and I were selected through a competitive process to serve as Social Science Research Advisors for the Ohio Department of Job and Family Services. We evaluated Requests for Proposals prepared by the department to ensure the requirements for work would answer the key questions of interest in scientifically sound ways. We also proposed research designs based on Ohio Department of Job and Family Services' specific needs and research questions.

8. I have published two articles in peer reviewed journals, have authored many research reports, presented research findings at multiple conferences, and am an editor of "The Cambridge Handbook of Implicit Bias and Racism" which was published by Cambridge University Press in 2025. My resume is attached as Exhibit A.

9. Since 2005, my work has focused on assisting with the design, oversight, analysis, and reporting of more than 20 surveys in the class action litigation context. I have particular experience in the areas of wage and hour class actions, in cases where surveys were used to measure the number of hours worked per week, the number of overtime hours worked per week, and the frequency with which class

members took required meal and rest breaks. I have also worked on surveys conducted to provide evidence to the courts about purportedly misleading advertising claims, improper classification of employees, and unreimbursed business expenses.

10. For each of these surveys, I helped to draft and pretest questions in survey questionnaires using best practices in survey research methods. I also oversaw the data collection firms who administered the survey questionnaires to class members, ensuring they followed all training guidelines, dialing protocols, and other instructions to ensure the data collected were valid and reliable. I conducted analysis of survey data in each of these cases, including weighting the survey data, calculating key estimates of the quantities of interest, the standard errors and confidence intervals around those quantities, and reporting this information in technical reports. This expertise has afforded me the skills to extrapolate from data collected in well-designed surveys that employ probabilistic sampling to the population from which those samples are drawn (i.e., from a random sample of class members to the entire class).

11. I also have experience conducting secondary data analysis in a litigation context – gathering and analyzing existing data to draw conclusions for courts to consider. In 2019, I assisted with a case that utilized election records to show that the order in which a candidate appears on the ballot influences candidates' vote

share. To complete this work, I supervised a staff of more than 15 people.

12. I worked for the National Institutes of Health to thoroughly test a questionnaire to measure various workplace experiences. I also worked for several years with Stratus Consulting and the National Oceanic and Atmospheric Administration (NOAA) overseeing the coding of tens of thousands of open-ended responses from surveys, for which I received an official commendation later from NOAA.

13. I have served as a consulting expert on six cases, including cases where I advised the testifying expert on specific question wordings to use to collect information in depositions of class members. I have been deposed in one case as a research assistant for another expert and I have been deposed in six cases in which I was the testifying expert.

14. In addition to litigation surveys, I have designed surveys using best practices in survey research methods for a variety of clients in the nonprofit, public, and private sectors. For instance, I regularly design and complete rigorous surveys to understand and quantify the health issues facing specific populations, and I helped the Ohio Department of Health complete a federally required, statewide survey of health departments to assess terrorism preparedness.

15. I have more than 10 years of experience teaching research methods to undergraduate students at The Ohio State University and to both undergraduate

and graduate students at Southern New Hampshire University (SNHU). In addition, I was selected to serve as a subject matter expert for the development of a two-course series in graduate research methods at SNHU.

16. I am a member of the American Association of Public Opinion Researchers (AAPOR), one of the leading professional organizations for survey researchers.

17. In all the survey research I conduct, I draw on my rigorous academic training and considerable professional expertise to conduct scientific surveys, employing methods that are generally accepted in my discipline.[1]

## 2. Understanding of the Key Issues in the Case

### 2.1. Case Background

18. Based on conversations with Plaintiff's attorneys and my review of the documents provided by Plaintiff's attorneys[2], my understanding is that Plaintiff alleges that during the proposed class period (which begins on May 31, 2020 and

---

[1] In her chapter, "Reference Guide on Survey Research" (3rd edition; in Reference manual on scientific evidence. Washington, D.C.: Federal Judicial Center, 359-423), Shari Diamond provides the following guidance for qualification as a survey expert, all of which I describe above: "Experts prepared to design, conduct, and analyze a survey generally should have graduate training in psychology (especially social, cognitive, or consumer psychology), sociology, political science, marketing, communication sciences, statistics, or a related discipline; that training should include courses in survey research methods, sampling, measurement, interviewing, and statistics. In some cases, professional experience in teaching or conducting and publishing survey research may provide the requisite background. In all cases, the expert must demonstrate an understanding of foundational, current, and best practices in survey methodology, including sampling, instrument design (questionnaire and interview construction), and statistical analysis." (Diamond, 2011, p. 375)

[2] See Exhibit B for a list of documents reviewed.

will end on the date of class certification), employees of Georgio Armani Incorporated ("Armani") who are putative class members were not paid for all of the time they worked. Specifically, employees were not paid for (1) time spent waiting to leave the store at the end of their shift, (2) waiting for and undergoing security checks, and (3) completing work tasks after clock out. The next few paragraphs detail these claims.

19. Armani policies required there to be at least two employees in the store at opening and closing time. See Defendant's Person Most Knowledge (PMK) discussion in deposition:

> *… two people that are in the store at the same time… two openers, two closers. (Johansen Depo. Vol 1, pg. 291, lines 1 – 4)*

20. Thus, employees could not enter or leave the store without another employee present. Jacqueline Ahumada described this in her deposition:

> *"...we're clocking out at the same time one by one and then going to our locker room... And just waiting there with our stuff while waiting for the manager to finish closing up and getting her stuff and closing down the computer and locking the safe and everything." (Ahumada Depo. p. 116, line 23 – 117, line1)*

21. All Armani employees were also subject to security screenings whenever they left the store, including for meal periods and at the end of their shifts. See Defendant's PMK deposition regarding employee security checks in stores:

> *If I am leaving for the day with a handbag of sorts, I need to be checked… the. I would have to have belongings to be checked… Anything that -- personal bags, shopping bags of sorts, anything where you could place items in. (Johansen*

*Depo. Vol 1, pg. 181, lines 3 – 14)*

22. These checks also applied in in-store kiosks, where they were done by loss prevention staff of the department store in which the kiosk was located:

*… there's not always a manager in a concessions at the time of departure, so, it would be loss prevention and the employee exit that would complete the bag check. (Johansen Depo. Vol 1, pg. 258, lines 2 – 7)*

23. Putative class members allege they had to wait for these security screenings and submit to them after they were clocked out. Jacqueline Ahumada described this in her deposition:

*"What Angela [MANAGER] had told me, that we all had to wait after clocking out to get our bags in the back and wait there until everybody was in the back and everyone was ready to leave to get our bags checked." (Deposition of Jacqueline Ahumada p. 103, lines 16-19)*

24. Putative class members also allege that they completed work tasks after clocking out at the end of their shift. These tasks included: restocking inventory, folding clothes, cleaning, and delivering products to customers. Jacqueline Ahumada described this in her Deposition:

*"Well, I mostly had the closing shift. So after clocking out, we would still be inside. And they would ask the manager in charge -- or the person in charge at that time would ask if we can help finish cleaning or folding clothes so we wouldn't leave it messy for the next day if we didn't finish on the time we were supposed to clock out." (Deposition of Jacqueline Ahumada p. 82, lines 8-14)*

*"Because I had to clock out at a certain time... I only was allowed to be on my scheduled shift basically. So I would clock out at the time, exact 10:00 p.m. And then – well, since we didn't finish, she would ask can you guys help." (Deposition of Jacqueline Ahumada p. 83, lines 12-16)*

25. Additionally, my understanding is that Plaintiff alleges that during the proposed class period, Armani employees who are putative class members were not reimbursed for all business expenses they incurred while working as team members at Armani – specifically, they were not compensated for the use of their personal cellular phones to communicate with customers and coworkers. This engagement was described as a one of employees' "Duties and Responsibilities" in multiple job titles:

- *Assistant Manager Job Description: Specifically exclusive, long-lasting, trusting relationships with clients by leveraging Client Relationship Management (CRM) strategies to ensure reachability expectations are met." (GAC 000116)*
- *Associate Client Advisor and Advisor Job Descriptions: "Leverage sales tools available to ensure clients are receiving service that meets their needs, i.e. virtual selling, OMNI Channel, sharing trends, etc." (GAC 000112)*
- *Cashier Job Description: "Execute Client Relationship Management (CRM) strategies to ensure reachability expectations are met… Support strong execution of OMNI channel, client initiatives (CRM) and charge sends" (GAC 000104)*
- *Client Advisor Job Description: Execute Client Relationship Management (CRM) strategies to ensure reachability expectations are met… Ensure strong execution of OMNI channel, client initiatives (CRM) and charge sends" (GAC 000102)*
- *Merchandise Flow Supervisor: "Support Client Relationship Management (CRM) strategies to ensure reachability expectations are met… Ensure strong execution of OMNI channel, client initiatives (CRM) and charge sends." (GAC 000106)*
- *Sales Manager Job Description: "Build exclusive, long-lasting, trusting relationships with clients by leveraging Client Relationship Management (CRM) strategies to ensure reachability expectations are met… Promote OMNI channel and client initiatives (CRM) aligning team on in-store execution" (GAC 000118)*
- *Sales Supervisor Job Description: "Build exclusive, long-lasting, trusting relationships with clients by leveraging Client Relationship Management (CRM) strategies to ensure reachability expectations are met… Promote OMNI channel and client initiatives (CRM) aligning team on in-store execution" (GAC 000108)*

- *Tailor Job Description: "Leverage sales tools available to ensure clients are receiving service that meets their needs, i.e. virtual selling, OMNI Channel, sharing trends, etc." (GAC 000114)*

26. Jacqueline Ahumada confirmed this in her deposition:

*"In the store, Angela* [MANAGER] *told us that we had to use our phone to get clients and customers." (Deposition of Jacqueline Ahumada p. 68, lines 9-11)*

*"I would use my phone to contact the customers that I had spoken to inside the workplace to show them the promotions that we had or were going to happen in a few days and, like, to ask them if they were interested and if they wanted anything that I can set aside for them..." (Deposition of Jacqueline Ahumada p. 69, line 24 – Page 17, line 4)*

## 3. My Assignment in this Case

27. My current assignment in this case is to understand how much time putative class members worked off the clock (for all the purposes outlined previously) and to determine how much the class is owed for unreimbursed business expenses. Should the Court require individual damages to be determined, a claim form can be created that each class member will complete for that purpose.

28. In this Declaration, I explain how I would design a survey, using best practices relied on by survey methodologists, to answer the following research questions at issue in this case:[3]

- How long did putative class members wait to leave a store so that they would not be alone in the store, per shift, on average?
- How long did putative class members wait for a security check and how long did the security check take, on average?

[3] Here I refer to "research questions" which are the concepts I have been asked to opine on, generally. These should not be construed as items that would appear on a survey questionnaire.

- How long did putative class members work off the clock on other work tasks per shift, on average.
- How often respondents said they did not take meal breaks away from the store because waiting for and undergoing security checks took too much time.
- How many putative class members used their personal cell phones to assist customers while working at Armani?
- How often did putative class members use their personal cell phone for work purposes?
- How much did putative class members pay for their personal cell phone service?

29. If Plaintiff's class certification motion is granted, I will design and supervise the administration of a survey and conduct analyses for the purpose of answering these questions, which may be used to inform the Court's decisions about Armani's liability and to help determine total classwide damages.

## 4. Designing A Survey in this Case

30. This assignment requires that I design and administer a survey using best practices and methods generally accepted by the scientific community for the purpose of answering the questions just discussed. Based on my knowledge of the claims in the case to date, if the class is certified, I can design and complete a survey using these methods to accurately measure these quantities of interest. Should I become aware of new facts pertaining to the claims at issue in the case, I reserve the right to adjust my approach to my assignment and amend my plans for designing and administering the survey as needed.

### 4.1. Proposed Methods to Design a Survey in The Current Case

31. Two authors have produced key texts on the use of survey research in a litigation context, specifically: Sheri Diamond, who wrote the Reference Guide on Survey Research published by the Federal Judicial Center and National Research Council of the National Academies; and Paul Lavrakas, who authored a chapter called "Research in Litigation" in the Litigation Services Handbook.

32. As Diamond points out, in order for a survey to assist judges and juries in the litigation context, it must follow best practices in survey research design.[4] I have done extensive training and research in the design, administration, and analysis of surveys. This experience, and my alignment with a set of best practices provided by The American Association of Public Opinion Research will guide my design of this survey.[5]

#### 4.1.1. Plan the Survey

33. During this phase, I will review documents provided by Plaintiff's counsel, including documents provided by the defense during discovery to gain a full understanding of the claims and facts at issue in this case. I will develop a final list of topics to explore in the survey and make a final decision on the mode of survey administration.

---

[4] Diamond, S. S. (2011). Reference Guide on Survey Research. In The Federal Judicial Center and National Research Council of the National Academies, *Reference Manual on Scientific Evidence* (3rd ed., pp. 359-423). Washington, DC: The National Academies Press.

[5] See "Best Practices in Survey Research" https://aapor.org/standards-and-ethics/best-practices/

34. I have successfully implemented telephone, Internet, in-person, mail, and mixed mode surveys (which combine more than one mode of administration). My current recommendation is to use a telephone survey to collect information about the work experiences of class members. I recommend telephone interviewing because the final class list will likely contain a name, address, and telephone number(s) for every class member, meaning that a telephone mode is feasible. Further, I am not seeking any sensitive information (e.g., I will not ask any questions about criminal behavior or personal health issues). As Lavrakas (2017)[6] notes, when such questions are not present, the presence of well-trained interviewers can lead to increased respondent cooperation, compared to self-administered survey modes. Finally, I do not anticipate providing any visual stimuli to survey respondents, making telephone survey methodology an optimal choice.

#### 4.1.2. Design Sampling Plan and Select Sample

35. It is my understanding that there are approximately 817 putative class members, but the total number is not yet known. Once a *final*, non-duplicative class list is produced, I plan to select a simple random sample from the list of all class members, if necessary. Probability sampling (of which simple random sampling is one form) means that each member of a population has a known, non-zero chance

[6] Lavrakas, P. J., & Stec, J. A. (2017). Survey Research in Litigation. In R. L. Weil, D. G. Lentz, & E. A. Evans (Eds.) *Litigation Services Handbook: The Role of the Financial Expert* (pp. 1-52). Wiley.

of being selected into the sample of population members who are invited to participate in a survey. Further, the sample members are selected by chance alone (i.e., by appending a set of randomly generated numbers to the units in the sampling frame, then sorting by that number, as I have done in other scientific surveys I have conducted).[7] This is a key step in conducting a scientific survey that allows me to generalize results (observed in a set of completed interviews) to the entire population.

36. However, future analysis of the final class list may suggest that further stratification is necessary – this can be used to ensure that important subgroups within the population are well-represented in the final. These decisions need not be made until the survey is going into the field, although it is important to have some understanding of the likely population to ensure that survey development is done with class members who closely resemble those who will participate in the survey.

#### 4.1.3. Design the Questionnaire: Exploratory Interviewing

37. To effectively design a questionnaire, one must understand best practices in survey research as well as the specific measurement goals of the instruments being developed; I have previously discussed these points, and as recommended by

[7] Dillman, D. A., Smyth, J. D., & Christian, L. M. (2014). Internet, phone, mail, and mixed-mode surveys: The tailored design method. Hoboken: John Wiley & Sons; Groves, R. M., Fowler, F. J., Couper, M. P., Lepkowski, J. M., Singer, E., & Tourangeau, R. (2009). Survey Methodology, 2nd Edition. Hoboken: John Wiley & Sons.

AAPOR have outlined the objectives of the survey above.[8]

38. Designing a survey questionnaire also requires an understanding of how the people who will be surveyed think about the topics at hand. I will achieve this understanding by interviewing class members to better understand how they think and talk about the topics of interest. Specifically, I will use exploratory interviewing, a technique that relies on asking open-ended questions to encourage respondents to talk about a topic in general terms, so I can better understand the way class members think and talk about the work they do or did at Armani.

#### 4.1.4. Design the Questionnaire: Creating and Testing a Questionnaire Draft

39. After my exploratory interviewing is completed, I will again follow best practices to create a survey questionnaire, designing questions to measure the key variables that are clear, unbiased, and simple to understand.[9] I will then test the survey questions, using some or all of the approaches recommended by Willson & Miller (2014) including "think aloud" (p. 20) pretesting (in which respondents tell the researcher all the thoughts going through their mind as they attempt to answer the questions with very little participation by the interviewer); "verbal probing" (p. 21) (in which interviewers ask clarifying questions to better understand respondents'

[8] See "Best Practice for Survey Research" Available online at https://aapor.org/standards-and-ethics/best-practices/

[9] See "Best Practices in Survey Research." Available online at https://aapor.org/standards-and-ethics/best-practices/

reactions to questionnaires); and the "interpretivist approach" (p. 21) (in which respondents are asked about their interpretation or understanding of a question, which I typically operationalize by asking them to attempt to say the question back in their own words).[10]

### 4.1.5. Use of Administrative Data

40. As I understand it, Plaintiff has retained an expert in statistics and damages to analyze data available for putative class members in this case. Presumably, during discovery Plaintiff will receive the store locations where putative class members worked and information about the days (and hours) worked. It will also include the length of each putative class member's employment by Armani. Another best practice in survey research is to avoid asking survey respondents questions about topics for which records are available.[11] Thus, my survey questionnaires will only collect information necessary to my assignment that is not provided by these records. At present, it is not clear to me when comprehensive classwide data will be available, so determining which records are available, and importantly, available for each member of the class throughout the class period, could impact survey design.

---

[10] Willson, S. & Miller, K. (2014). Data Collection. In K. Miller, S. Willson, V. Chepp, & J. L. Padilla (Eds.) *Cognitive Interviewing Methodology* (pp. 15-34). Hoboken, New Jersey: John Wiley & Sons.
[11] See "Best Practice for Survey Research." Available online at https://aapor.org/standards-and-ethics/best-practices/

### 4.1.6. Optimization

41. At this point, I plan to optimize questions for telephone interviewing, providing instructions for interviewers and scripting all potential interactions, ranging from the introductory portions of telephone calls that explain the survey and encourage potential respondents to complete interviews, responses to questions I anticipate potential respondents might ask, and answering machine messages to leave for potential respondents.

42. During this phase, I will also draft a prenotification letter to encourage participation. This letter will inform class members of future contact attempts and will include a small monetary incentive ($1 or $2). It will also tell class members about how long the interview will take and will let them know about the incentive that will be offered for their participation. Incentives have a long history of use in mail surveys, and at least two meta-analyses of studies involving interviewers (i.e., telephone and face-to-face survey methods) suggest improved response rates when incentives were offered and, thus, may reduce non-response bias.[12] This improvement may be especially evident for potential respondents who are not intrinsically motivated to complete a survey interview by reducing refusal rates.

[12] See Yu, J. & Cooper, H. (1983). A Quantitative Review of Research Design Effects on Response Rates to Questionnaires. *Journal of Marketing Research*, *20*, 1, 36-44 and Singer, E., Van Hoewyk, J., Gebler, N., & McGonagle, K. (1999). The effect of incentives on response rates in interviewer-mediated surveys. *Journal of Official Statistics*, 15(2), 217.

## 4.2. Collecting Data

43. Once the survey questionnaire is finalized, I will work with a data collection firm to administer the survey questionnaire to class members. I have considerable experience with several data collection firms who are familiar with the rigor required to conduct a high-quality survey. The data collection firm will program the questionnaire into a Computer Assisted Telephone Interview system, which will reduce interviewer and data entry error. I will provide scripts for interviewers to use, including scripts for recruitment, responses to questions and scripts for attempting to convert potential respondents who initially refuse to complete the interview. My staff and I will participate in project-specific interviewer training with the goal of helping interviewers understand the project and become familiar with the scripts. Importantly, the interviews will be conducted in a double-blind manner, meaning that neither the interviewers nor the respondents will know who is sponsoring the survey. This step helps reduce the potential for biased responding.[13]

44. The data collection firm will attempt to locate correct addresses for class members and as many telephone numbers as possible shortly before interviewing begins. Call attempts will be made to respondents at different times of day on different days of the week for a field period lasting at least one month. My staff and I

[13] See Diamond's recommendation (pg. 374).

will monitor interview progress daily and may adjust dialing schedules or take other steps to gain respondent cooperation. Each of these steps will boost response rates and help alleviate the potential for non-response bias, an ever-present concern for survey researchers.

45. Next, I will complete the final step in the testing and development process. Specifically, a conventional survey pretest will be conducted during which interviewers will complete interviews with a random sample of class members. These pretests will serve as a dry run of the full survey administration and will identify any final issues with the CATI programming or respondents' ability to understand and respond to the survey questions. My staff and I will listen to these interviews to offer feedback. All these preparation steps are in line with AAPOR's best practices for survey research.[14]

### 4.3. Data Analysis and Reporting

46. My staff and I will analyze the data that are collected, including implementing standard statistical adjustments to account for design factors and non-response (if necessary). Though I have no reason to believe people cannot accurately remember the work experiences I will ask them about, I will also conduct analyses to explore potential impacts of memory on the answers provided by

[14] See "Best Practices in Survey Research" https://aapor.org/standards-and-ethics/best-practices/

respondents. That is, I will compare responses provided by people who worked longer ago to responses provided by those who worked more recently (because one could assume that people who worked more recently might have more accurate memories) and responses provided by people who worked for longer or shorter amounts of time during the field period (because one could assume that people who worked for longer amounts of time might have more accurate memories). Should I find any differences in responses based on these factors, I can perform statistical adjustments to take these differences into account. Similarly, I will compare the characteristics of people who completed the survey to the characteristics of all employees in the class when possible. Such comparisons could include the length of employment, recency of employment, the work locations to which employees were assigned, and any information provided to me that is available for each class member regardless of survey completion status.

47. I will prepare a report detailing the design and findings of the survey(s) and include documentation of all steps taken to conduct them. At present, I anticipate this report will include statistics from participating respondents (that can be generalized to the class) for:[15]

- The average amount of time, per shift, respondents waited for other employees so they could enter or leave the store.

[15] This is a list of quantities I will compute and report; they should not be construed as the questions that will be asked of respondents in the survey.

- The average amount of time, per shift, respondents waited for, and participated in, security checks.
- The average amount of time, per week, that respondents did other work tasks off the clock
- The percentage of days respondents did not take meal breaks away from the store because waiting for and undergoing security checks took too much time.
- The percentage of respondents who used their personal cell phones to communicate with customers.
- The average amount that respondents paid for their personal cell phone service, per month

48. I will also clearly document all the work I did in the report, as recommended by AAPOR. [16] My report will include all of the information that Diamond (2011) suggests should be disclosed (see pg. 415), including the purpose of the study, a definition of the target population and the sampling frame, a description of the sample design, interview mode, contact attempts, and the dispositions of all people whom I attempted to contact, including how many people were ineligible, refused to participate, or ended the interview before they completed. My report will also include all materials used to conduct the study, including the instructions and training provided to interviewers and a description of how I analyzed the data, including the weighting procedures I used and margins of error for each statistic.

## 5. Variability in Class Member Experience

[16] See "Best Practices in Survey Research" https://aapor.org/standards-and-ethics/best-practices/

49. As I understand it, there are approximately 28 different work locations under different brand names, with some operating as a store and others operating as a kiosk within a department store represented in the putative class. However, as noted in the class complaint, a single HR department, all co-located, set policies for all Armani employees. At present I have no reason to believe these differences would impact the key quantities I am attempting to estimate in this case, but I will listen for such indications during exploratory interviewing.

50. If such concerns do emerge, either from pretesting or from other documents provided to me for review, they can be remedied by stratified sampling provided that full and accurate lists of (1) all store locations in the class; and (2) records that link potential class members to those locations throughout the entirety of their employment during the class period are made available. With this approach, experiences across facilities can be measured and statistical adjustments can be made to ensure the impact of this design on classwide averages is accounted for.

## 6. Acceptability of Survey Research in Litigation

51. Diamond (2011) points out that "Surveys are routinely relied upon in many settings, including litigation" and that they "are used widely in business, government, and, increasingly, administrative settings and judicial proceedings." (p.

364-365).[17] This is because a properly designed and executed survey can provide valid and reliable estimates of key quantities by measuring those quantities in a subset of class members. Such techniques can eliminate the time-consuming processes required to elicit individual testimony from many witnesses, especially with a class that is as large as the putative class in this case.

52. In fact, Diamond asserts the possible superiority of survey evidence over other approaches:

> *As a method of data collection, surveys have several crucial potential advantages over less systematic approaches. When properly designed, executed, and described, surveys (1) economically present the characteristics of a large group of respondents or other units and (2) permit an assessment of the extent to which the measured respondents or other units are likely to adequately represent a relevant group of individuals or other units.* (p. 362)[18]

53. Lavrakas (2017) draws a similar conclusion, stating, "Surveys provide a systematic approach, accepted in the scientific community, that can meet the requirements that expert testimony must satisfy to be admitted in court," (p.7),[19] namely that the expert uses a "statistically rigorous sampling approach" and "valid methodologies to address non-response."

---

[17] Diamond, S. S. (2011). Reference Guide on Survey Research. In The Federal Judicial Center and National Research Council of the National Academies, *Reference Manual on Scientific Evidence* (3rd ed., pp. 359-423). Washington, DC: The National Academies Press.
[18] Diamond, S. S. (2011). Reference Guide on Survey Research. In The Federal Judicial Center and National Research Council of the National Academies, *Reference Manual on Scientific Evidence* (3rd ed., pp. 359-423). Washington, DC: The National Academies Press.
[19] Lavrakas, P. J., & Stec, J. A. (2017). Survey Research in Litigation. In R. L. Weil, D. G. Lentz, & E. A. Evans (Eds.) *Litigation Services Handbook: The Role of the Financial Expert* (pp. 1-52). Wiley.

## 7. Remedies for Common Concerns About Survey Research

54. The most common critiques of survey research are twofold: survey respondents may not remember things accurately and surveys may suffer from non-response bias. I will briefly address each of these critiques and illustrate how these two potential threats can be minimized.

### 7.1. Concerns About the Memories of Survey Respondents

55. As Daniel Reisberg, a noted memory researcher, writes in a book expressly discussing how research on perception and memory should be considered in a legal context, "Perception does not operate like a video and camera; memory does not operate like a video recorder. Perception and memory are… more active, more dynamic than these electronic devices, and are, in particular, selective, constructive and integrative in ways that the devices are not… the fact remains that our perception and memory are accurate more often than not..."[20]

56. Indeed, researchers' well-intentioned desire to prevent things like the misidentification of perpetrators by eyewitnesses or the over-reliance on recovered repressed memories may have inadvertently skewed the literature against demonstrating such accuracy. As Koriat, Goldsmith & Pansky note, "…while memory may in fact be more fallible and malleable than is assumed by the layman, it seems

[20] Reisberg, D. (2014). *The Science of Perception and Memory: A Pragmatic Guide for the Justice System*. Oxford University Press, USA.

to us that the interest in memory illusions and false memories, spurred perhaps by real life problems, has led researchers to selectively focus on the dark side of memory, resulting in a somewhat biased picture."[21]

57. While I am aware of no studies that include comparisons of records of the use of personal cell phones for work-related purposes to employees' memories of those events, I am aware of some studies that suggest optimism for peoples' ability to remember events from longer ago. This includes work that looked at recognition of names of classmates and grades, across long periods of time, both of which can be verified against school records. These studies found high school grades were accurately recalled up to four years after they were earned and that memory for faces was even more well maintained – subjects could recognize their classmates' names and faces with 90 percent accuracy up to 15 years later.[22]

58. Linton (1982) also found high recall accuracy, even for seemingly mundane life events. Specifically, after 6 years, she was able to demonstrate recall of 70% of mundane life events listed in her diary. She also found that unique events were better remembered (relative to repeating events), in which case she seemed to

[21] Koriat, A., Goldsmith, M. & Pansky, A. (2000). Toward a psychology of memory accuracy. *Annual Review of Psychology*, 51, 481-537.
[22] Bahrick, H. P., Bahrick, P. O., & Wittlinger, R. P. (1975). Fifty years of memory for names and faces: A cross-sectional approach. *Journal of Experimental Psychology: General, 104*(1), 54–75; Bahrick, H. P., Hall, L. K., & Berger, S. A. (1996). Accuracy and distortion in memory for high school grades. *Psychological Science*, 7(5), 265-271.

recall the "gist" or basic idea of an event. Notwithstanding the limitations of diary methods and the low sample size (n = 1), this study does suggest a general memory for events that are repeated across time could be a highly accurate approximation of the average experience of individuals. This is a perfect characterization of the events I intend to measure in this case.

59. In some cases, memory errors, like all other sources of error in surveys, may be inconsequential if randomly (or even systematically, but equally) distributed among survey respondents. For instance, in studies that ask respondents to identify the date of an event, a common effect called "telescoping" has been observed. Essentially, telescoping occurs when events that occurred more recently are judged to be further in the past than when they actually occurred (this is called "backward telescoping") and events that occurred longer ago are judged to be more recent than when they actually occurred (this is called "forward telescoping"). While both of these biases have been shown to occur in dating studies, it's not necessarily true that they would systematically bias the estimates derived from the survey – for instance, if most respondents did not telescope at all, some telescoped backwards, and some telescoped forwards, the actual estimate of the date of an event could be completely accurate, even given the response tendencies described here. In fact, Gaskell et al (2000) & Means et al (2008) found such cancelling effects in two

separate studies.[23] Though I would not ask respondents to specifically date anything I'm measuring in this case, the idea that memory errors can be randomly distributed and cancel one another out in a sample of respondents applies.

60. Lastly, it should be noted that arguments impugning memory for events from long ago, if followed to their logical extreme, would absurdly indict and prohibit all litigation evidence that relies on human reports.

#### 7.1.1. Improving Memory Accuracy with Good Questionnaire Design

61. Groves et al. (2009)[24] make recommendations to improve memory accuracy in surveys generally, including consulting records, using personal landmarks, or life event calendars, tailoring the length of the reference period to the characteristics of the event of interest, using multiple cues to improve recall of specific events, decomposing an event into its component pieces, and using longer

---

[23] In a study of two landmark events separated by roughly three years, he and his colleagues found both forward and backward telescoping and concluded that for one event, "for every three who backward telescoped, four forward telescoped," while for a second event, separated by three years, they found the mirror opposite - for every three forward telescopers there were four backward telescopers." Gaskell, G. D., Wright, D. B., & O'Muircheartaigh, C. A. (2000). Telescoping of landmark events: implications for survey research. *The Public Opinion Quarterly*, 64(1), 77-89. Means et al found reach a similar conclusion when studying reports of a frequent, but low salience behavior (cigarette smoking). Specifically, they state: "when we examine the net error for the group as a whole (rather than as the mean absolute value for the errors as reported above), subject's errors tend to cancel each other out; that is, some subjects gave reports that were too high, whereas others gave reports that were too low." See Means, B., Swan, G. E., Jobe, J. B., & Esposito, J. L. (1994). The effects of estimation strategies on the accuracy of respondents' reports of cigarette smoking. In *Autobiographical Memory and the Validity of Retrospective Reports* (pp. 107-119). Springer, New York, NY.

[24] Groves, R.M., Fowler, F.J., Couper, M.P., Lepkowski, J.M., Singer, E. & Tourangeau, R. (2009). Survey Methodology, 2nd Edition. Hoboken: John Wiley & Sons, Inc.

introductions to slow the pace of the interview.[25]

62. I have applied some of these principles in the past. For instance, I have trained interviewers to ask survey questions at a slower pace than they normally would. I will do the same in this case. And, some of these principles suggest strategies that might be employed once I learn more about class member experiences through testing and have drafted my questionnaire(s).

63. Fischer et al (2000) tested some of the interviewing techniques used by forensic police investigators in a method called cognitive interviewing in a survey context. This work echoes much of what Groves et al (2009) recommended and provides two novel suggestions, both of which I would likely employ in the current case, namely, clearly communicating the needs of the interviewer, and building additional probes into questions about some activities.[26] In prior studies, I have also encouraged respondents to take as much time as needed and to think out loud, if necessary, which Belli (1998) found improved recall of autobiographical memories.[27]

64. Obviously, this discussion is not an extensive review of the memory

---

[25] For instance, if the goal is to discuss a specific instance of a more mundane event, or of one of a series of repeated experiences, it may be a good idea to ask about a more targeted recall period, if possible. However, if researchers are interested in more memorable, rarer events, it might be better to ask about a longer period of time.

[26] Fischer et al (2000) did this by asking respondents to first access information via a weekly schedule, and then into daily timeframes. See Fischer, R. P., Falkner, K. L., Trevisan, M., & McCauley, M. R. (2000). Adapting the cognitive interview to enhance long-term (35 years) recall of physical activities. *Journal of Applied Psychology*, *85*(2), 180.

[27] Belli, R. F. (1998), The structure of autobiographical memory and the event history calendar: Potential improvements in the quality of retrospective reports in surveys." *Memory*, *6*(4) p. 383-406.

literature; it should not be construed to suggest that people do not forget things. Rather, these studies support my opinion that if good survey questionnaire design practices are followed, the claim that people cannot remember things that happened long ago is false.

#### 7.1.2. Testing and Adjusting for Memory Impacts

65. In addition to taking steps to improve the accuracy of memories that respondents draw on to answer survey questions, survey researchers can also attempt to identify respondents whose memories may be less accurate – including, in this case, respondents who worked longer ago and respondents who worked for shorter periods of time. These factors can be examined for its link to responses on the survey and statistical adjustments could be performed to adjust for such effects if warranted.

### 7.2. Concerns About Non-Response Bias in Survey Results

66. Another common concern that is raised about survey research involves bias due to the response rate observed. Specifically, many people assume that results that are computed from a participating sample of a population do not reflect the true population values for those measures if not all potential respondents participate in the survey. Fortunately, there are ways to (1) reduce the potential for non-response bias; and (2) test and correct for its potential effects.

#### 7.2.1. Potential Non-Response Bias

67. Many people believe that as the response rate to a survey declines, the results from the survey become less accurate. However, research in the literature on survey research methodology suggests that this is not always the case. One way that scholars have tested for the effect of non-response bias is by comparing election results to exit polls, with the presumption that the actual election results should be closely matched by exit polls if non-response error does not impact the results. For instance, in a comparison of exit poll results with actual election returns in 1992, Merkel & Edelman (2002) state: "It is commonly assumed that surveys with lower response rates will have a greater amount of survey error than those with higher response rates. But contrary to conventional wisdom, there is either very little or no correlation between response rates and the signed error." They conclude, "Knowing the response rates has almost no predictive power when it comes to explaining exit poll error."[28] Similarly in a chapter titled "Survey Research" in the 1999 Annual Review of Psychology, Krosnick concluded: "It is important to recognize the inherent limitations of nonprobability sampling methods and to draw conclusions about populations or differences between populations tentatively when nonprobability sampling methods are used. But when probability sampling methods are used, it is no longer sensible to presume that lower response rates necessarily signal lower

[28] Merkle, D., & Edelman, M. (2002). Nonresponse in exit polls: A comprehensive analysis. In R. M. Groves, D. A. Dillman, J. L. Eltinge, & J. A. Roderick (Eds.), Survey Nonresponse (pp. 243-258). New York: Wiley.

representativeness."[29]

68. Another strategy for assessing the relationship between response rate and potential non-response bias is illustrated by Keeter and his colleagues in 1997. Specifically, Keeter et al found similar results when comparing what they call a "Standard" survey administered over a 5-day field period that sampled whichever adult answered the telephone to a "Rigorous" survey conducted over an 8-week period that randomly selected the respondent from all adults in the household. Not surprisingly, these effort levels result in different response rates – 61% compared to 36%. What may be surprising to those unfamiliar with the literature is the impact of these wildly different response rates: the authors found no evidence of non-response bias. Amid a continual decline in response rates, Keeter and a second group of colleagues replicated this work nearly 10 years later, again finding no significant differences in 77 out of 84 comparisons between a "Rigorous" and a "Standard" survey.[30]

69. AAPOR has drawn a similar conclusion stating, "Results that show the least bias have turned out, in some cases, to come from surveys with less than optimal response rates. Experimental comparisons have also revealed few significant

[29] Krosnick, J. A. (1999). Survey research. *Annual Review of Psychology*, *50*(1), 537-567.
[30] Keeter, S., Kennedy, C., Dimock, M., Best, J. & Craighill, P. (2006) Gauging the Impact of Growing Nonresponse on Estimates from a National RDD Telephone Survey. *Public Opinion Quarterly*, 70, 5, 2006, 759–779. In this paper the authors discuss the 1997 study and a later replication.

differences between estimates from surveys with low response rates and short field periods and surveys with high response rates and long field periods."[31]

### 7.2.2. Reducing Non-Response with Optimal Survey Research Methods

70. There are many accepted survey research practices that I can undertake that will reduce the potential for non-response to impact my expert conclusions – in fact many of the best practices in my field are designed to ensure that non-response does not impact survey estimates.

#### 7.2.2.1. Methods to Locate and Interview Respondents

71. One set of steps that I take is designed to locate and interview as many sampled class members as possible. As noted earlier, the contact lists in this case must be updated. I will ask the fieldwork firm I retain to conduct thorough searches using multiple lookup services to gather as many telephone numbers (including cell phone numbers) and mailing addresses as possible for each potential respondent.

72. In addition to finding different telephone numbers and addresses for each potential respondent, I will also instruct the telephone fieldwork firm to place calls to potential respondents at different times of the day and on different days of the week to maximize the potential for reaching the potential respondent at a time that works for them.

---

[31] https://www-archive.aapor.org/education-resources/for-researchers/poll-survey-faq/response-rates-an-overview.aspx

73. The telephone fieldwork firm will be available to conduct interviews at any time that is convenient for potential respondents between 9 am and 9 pm Pacific and will have the ability to schedule appointments at specific times requested by potential respondents. Interviewers will also be able to suspend an interview if a respondent cannot complete it after starting and return to it later when the respondent is available.

#### 7.2.2.2. Methods to Encourage Class Members to Respond to the Survey

74. Once potential respondents are located, I will take several steps to reduce differences between the class members who respond to the survey and those who do not. For instance, I will send potential respondents an advance letter that will inform them of future contact attempts. This can encourage class members to accept the calls from the research firm. I will also include a small monetary incentive ($1 or $2), which as Dillman (2014) points out, has been shown to increase response rates. This prepaid incentive may be especially motivating for more reluctant potential survey respondents and younger potential survey respondents, who are sometimes less likely to respond to surveys.[32] The incentive for completing

[32] Dillman, D. A., Smyth, J. D., & Christian, L. M. (2014). Internet, phone, mail, and mixed-mode surveys: the tailored design method. (p.370). Hoboken: John Wiley & Sons; Groves, R. M., Fowler, F. J., Couper, M. P., Lepkowski, J. M., Singer, E., & Tourangeau, R. (2009). Survey Methodology, 2nd Edition. (p. 206). Hoboken: John Wiley & Sons.

the interview will also be mentioned in the advance letter.

75. I will also attempt to convert refusals, which is a standard practice in survey research. Specifically, if a potential respondent says he or she is not interested in participating but does not explicitly ask the telephone fieldwork firm to stop calling, the case will be assigned to a senior interviewer who is trained to encourage these people to respond. Thus, if those who refuse to participate are different than those who do not, this step should reduce the potential for non-response bias.

#### 7.2.2.3. Use of Double-Blind Survey Methodology

76. A final common concern about non-response bias has to do with the reasons that people may choose to participate in the research. For example, if only class members who frequently used their personal cell phones to communicate with customers participated in the survey, this could bias the estimates derived from it. Fortunately, it is possible to completely eliminate such concerns in this case and doing so is my standard practice. The respondents in my survey will never be told that the research is related to litigation. Furthermore, I will attempt to focus in on their work experiences gradually so that if respondents connect this survey specifically to their work at Armani, it will happen well after they decide to participate in the survey. And most importantly, any questions that ask about awareness of the lawsuit, should I choose to include them, will be placed at the end

of the survey.

#### 7.2.3. Testing and Adjusting for Potential Indicators of Non-Response Bias

77. In addition to taking the steps I've outlined to reduce survey non-response, which will reduce the possibility of non-response bias, I can also test for the impact of such bias and statistically adjust for such impacts if I do find them. There are at least three types of analyses I could do to test and adjust for non-response bias.

78. I will use whichever characteristics that are known about the class to compare respondents to non-respondents. Because I do not know what information will eventually be provided, it is premature to speculate on what specifically will be included in my analysis, but it will likely include indicators related to their employment history (e.g., dates and length of employment and stores where employees worked) and demographic characteristics (e.g., age, gender, and where the respondent lives). Any deviations between the characteristics of those who completed the survey and the entire population can be adjusted by using post-stratification weighting, a standard practice in survey research.

79. I will also compare respondents who completed the survey to one another to determine if those who were easier to reach (e.g., those who called in to participate vs. those who did not) provided different answers than respondents who were harder to reach. I can then model the impact of these differences and adjust

for them statistically.

80. Finally, because non-respondents will have no way to know what the survey is about, the only potential cause for non-response attributable to the purpose of the survey would occur well after the respondent started the survey, perhaps when the class date is first mentioned. Analysis of partial interviews can be used to diagnose this possibility. In my experience, it is rare for respondents to stop answering questions after they have initially agreed to respond and these are the only people who could selectively choose not to participate based on survey purpose.

## 8. Calculating Damages

81. A survey designed as specified here, based on sound scientific methodology, will provide valid estimates of time worked off the clock completing tasks, waiting for another employee to leave the store and undergoing security searches, as well as the percentage of employees who used their personal cell phone to assist customers, how often employees did this, and their average monthly cost for personal cell phone service. Because probability sampling (i.e., randomly selecting units from the population to include in the sample of potential respondents, if sampling is used) is included in this design, statistics computed from the sample of employees who complete an interview can be generalized to the population, and a margin of error and 95 percent confidence interval around those

estimates can be provided. The results of this survey could be used to support Plaintiff's claims of liability and to calculate classwide damages, provided records are available for all class members, to determine the total number of employees who are eligible for damages.

82. To apportion damages to individual class members, my understanding is that a claim form may be used. This claim form would ask each claimant to indicate if he or she ever completed tasks off the clock, waited for employees to leave the store after clocking out, underwent security searches after clocking out, and the time each of these items took, as well as if the claimant ever assisted customers using their personal cell phone, how often they used their cell phone for work-related purposes, and their average monthly cost for personal cell phone service.

## 9. Conclusions

83. Based on my work on this case so far, I believe that a well-designed survey, following established principles in the field of survey research methods can be designed to accurately measure the key concepts of interest in this case, including:

- The average amount of time, per shift, respondents waited for other employees so they could enter or leave the store.
- The average amount of time, per shift, respondents waited for, and participated in, security checks.
- The average amount of time, per week, that respondents did other work tasks off the clock
- The percentage of days respondents did not take meal breaks away from

the store because waiting for and undergoing security checks took too much time.

- The percentage of respondents who used their personal cell phones to communicate with customers.
- The average amount of time per month respondents spent using their personal cell phone for business purposes.
- The average amount that respondents paid for their personal cell phone service, per month

## 10. Compensation

84. The Strategy Team, Ltd. is being compensated at the rate of $550 per hour for my time, excluding depositions and testimony; time for those activities will be compensated at the rate of $750 per hour. The Strategy Team, Ltd. is being compensated for the time of other staff at rates ranging between $100 per hour and $400 per hour.

85. I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. This declaration was signed November, 3, 2025 in Columbus, Ohio.



Amanda Scott, Ph.D.

Exhibit A

**Amanda L. Scott, Ph.D.**

**The Strategy Team, Ltd.**
5258 Bethel Reed Park
Columbus, Ohio
amanda@strategyteam.com

Overview

Dr. Amanda Scott is a social psychologist whose academic training focused primarily on stereotyping, group behavior, and legal decision-making. She has additional academic training in the areas of attitude measurement, research design, and survey methodology.

She has over 16 years of professional and consulting experience in applied research, including project management and statistical support to expert witnesses who conduct survey research in the context of class action litigation. She also conducts public opinion polling, branding / positioning research, program evaluations, product testing, and marketing / communications studies.

Education

B.A., Ohio Wesleyan University (in Psychology and Sociology), 2000

M.A. & Ph.D., The Ohio State University (in Social Psychology), 2000-2005

Employment

1999-2001 Research Associate, Ohio Department of Jobs and Family Services

2001-2002 Project Director, Port Columbus Airport Customer Satisfaction Survey

2003-2005 Teaching Assistant and Research Fellow, Ohio State University

2005-present The Strategy Team, Ltd. (Partner & V.P., Litigation Research)

Expert Witness Retentions

- Kirby v. Kindred Healthcare Operating, LLC (Deposed 1.28.20)
- Anderson v. RSCR California, Inc. (Deposed 6.12.20)
- Navarro v. United Parcel Service, Inc.
- Mendoza v. West Coast Quartz Corporation (Deposed 6.18.22)
- Brum et al vs. MarketSource, Inc. (Deposed 7.25.22)
- Williams vs. US Bank (Deposed 5.8.23)
- Poledoris vs. Mrs. Gooch's (Deposed 2.21.24)
- Starrett, Hayes & Ryan v. Immedia Semiconductor LLC; and Amazon.com Services LLC (Deposed 2.23.24)

Consulting Expert Retentions

- Mahoney Law Group, Long Beach, California
- Diversity Law Group, Los Angeles, California
- Stevens & McMillan, Tustin, California
- Meyer Wilson, Columbus, Ohio
- Gutride Safier LLP, San Francisco, California

Professional and Consulting Experience-Litigation Research Support

- Arias, Ozzello & Gignac, LLP, Los Angeles, California
- Capstone Law, Los Angeles, California
- Cohelan & Khoury, San Diego, California
- Delmar Law Group, Del Mar, California
- Gustafson Gluek, PLLC, Minneapolis, Minnesota
- Graham Hollis, APC, San Diego, California
- Hurst & Hurst Law firm, San Diego, California

- Industrial Economics Inc., Boston, Massachusetts
- Kershaw, Cutter & Ratinoff, LLP, Sacramento, California
- Khorrami Pollard & Abir LLP, Los Angeles, California
- Law Offices of Kevin T. Barnes, Los Angeles, California
- Law Offices of Ronald A. Maron, San Diego, California
- Leonard Carder, LLP, San Francisco, California
- Matern Law Group, PC, Manhattan Beach, California
- McCune Wright Arevalo LLP, Ontario, California
- Milstein Adelman, LLP, San Francisco, California
- Perkins Coie, Washington, D.C.
- R. Rex Parris Law Firm, Lancaster, California
- Rukin, Hyland Doria & Tindall LLP, San Francisco, California
- Saltz, Mongeluzzi, Barrett, & Bendesky, Philadelphia, Pennsylvania
- Seterah Law Group, Beverly Hills, California
- Shenoi Koes, LLP, Pasadena, California
- Stratus Consulting, Boulder, Colorado
- Wilshire Law Firm, Los Angeles
- Wynne Law Firm, Greenbrae, California

Academic Publications

Krosnick, J., Stark, T. & Scott, A., Eds. (2025). The Cambridge Handbook of Implicit Bias and Racism. Cambridge University Press: Cambridge.

Scott, A. (2002). Counterfactuals, focus and severity: How what could have happened can change judgments of what actually did happen. Degree: Master of Arts, Psychology, Ohio State University.

Rucker, D., Polifroni, M., Tetlock, P.E., & Scott, A. (2004). On the assignment of

punishment: The impact of general societal threat and the moderating role of severity. *Personality and Social Psychology Bulletin*, *30*(6), 673-684.

Scott, A. (2005). Stereotypes about victims: How what we think we know about others impacts our legal judgments. Degree: Doctor of Philosophy, Psychology, Ohio State University.

Tetlock, P.E., Visser, P., Singh, R., Polifroni, M., Scott, A., Elson, S.B., Mazzocco, P., & Rescober, P. (2007). People as intuitive prosecutors: The impact of social control motives on attributions of responsibility. *Journal of Experimental Social Psychology*, *43*(2), 195-209.

MacInnis, B., Krosnick, J.A., Scott, A., Malka, A., Albertson, E. (Unpublished Manuscript). Americans' Preference for Domestically Made Products: New Experimental Evidence from a Nationally Representative Sample.

Conference Presentations

Scott, A., Tichy, M., Holbrook, A., & Anand, S. (2003, May). *Customer Satisfaction Research: The Impact of Study Sponsor, Response Option, and Question Order.* Presented at the annual meeting of the American Association for Public Opinion Research, Nashville, TN.

Scott, A., Polifroni, P., & Rucker, D. D. (2004, January). *What makes a threat to social order threatening? Hedonic Relevance, Group Membership, and Self Interest as components of threats to social order.* Presented at the annual meeting of the Society for Personality and Social Psychology (Justice Preconference), Austin, TX.

Scott, A. (2005, May). *The Impact of Victims on Legal Judgments.* Presented at the annual meeting of the Midwestern Psychological Association,

Chicago, IL.

Professional Affiliations

American Association of Public Opinion Research

American Society of Trial Consultants

*Updated November, 2025*

# Exhibit B

Deposition of Jacqueline Ahumada, Volume 1. Taken ion Tuesday, May 13, 2025.

3 - Job Descriptions.pdf

First Amended Complaint & Enforcement Action Under the Private Attorneys General Act. Filed August 28, 2024.

Transcript of Danielle Marissa Johnson, Taken on June 24, 2025